IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 1, 2022

**TROY SPRINGFIELD v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Madison County
No. C19-274 Donald H. Allen, Judge**
_____

**No. W2021-00462-CCA-R3-PC**
_____

The petitioner, Troy Springfield, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received the effective assistance of counsel. After our review of the record, briefs, and applicable law, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR. and JOHN W. CAMPBELL, SR., JJ., joined.

J. Colin Morris, Jackson, Tennessee, for the appellant, Troy Springfield.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Jody S. Pickens, District Attorney General; and Al Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

***Facts and Procedural History***

*I. Trial*

The petitioner was convicted of attempted voluntary manslaughter, aggravated assault, felon in possession of a firearm, and employing a firearm during the commission of a dangerous felony, for which he received an effective sentence of twenty years' confinement. On direct appeal, this Court set forth the relevant facts as follows:

The victim, Ticie Johnson, testified that [the petitioner] is her ex-boyfriend, and they dated for approximately one year before she broke up with him in November or December of 2014. The victim testified that between November 2014 and February 10, 2015, [the petitioner] still called and texted her, but she did not respond. She also saw him at work. The victim explained that she and [the petitioner] worked for different companies, but both were housed inside of the Kellogg factory in Jackson.

On February 10, 2015, the victim left for work at approximately 4:30 a.m. As she was driving to work, she stopped at the stop sign on Crescent and Park Avenues. The victim began to turn and heard "a noise hit the side of the car on the right side in the back door[.]" The victim thought that she ran over something. She heard another sound and then realized that someone was shooting at her. The shot hit her back window and shattered it, but the glass did not immediately fall out. The victim testified that she "turned on out and another bullet hit the back window, and it still didn't break[.]" She ducked down, and a third bullet struck the window. The victim testified that she looked between the seat and the door and saw [the petitioner] standing outside in the middle of the street pointing a handgun at the back of her car. She then sped away and drove to the Kellogg factory. The victim testified that she thought that she was going to die when she realized [the petitioner] was shooting at her. She heard a total of four shots.

The victim testified that she did not drive home because her children were there, and she did not want [the petitioner] to follow her. She called her mother on the way to the Kellogg factory, and her mother called police. The victim arrived at the factory and advised a security guard of the shooting. She went inside the "guard shack" and waited for police to arrive. The victim testified that she looked at her car after police arrived. She said: "There was a bullet hole on the back door at the bottom and the window was out, and it had a mark on the side where the bullet ricocheted and hit the side." The victim noted that the car she was driving actually belonged to her mother. The victim paid approximately $257 to repair the window. The victim testified that [the petitioner] arrived at the factory after police got there, and she advised them that he was the shooter. She said that the police went over and attempted to make contact with [the petitioner].

On cross-examination, the victim agreed that she testified at the preliminary hearing that she saw the "form" of a man at the time of the shooting and that she did not see his face or the clothes that he was wearing. The victim testified that she identified [the petitioner] as the shooter when

she ducked down and looked through the window. On redirect examination, the victim testified that she was able to identify [the petitioner] at the time of the shooting based on his size and body shape.

Officer Christopher Austin of the Jackson Police Department testified that he and Officer McCrary were dispatched to the Kellogg factory at approximately 5:00 a.m. on the morning of the shooting. Officer Austin spoke with the victim who was "kind of distraught, kind of crying, [and] upset." The victim told him that she heard gunshots while on Crescent Avenue, and she showed him the damage to her vehicle. She said that she got out of the area as quickly as possible because she was afraid for her life. Concerning the damage to the victim's car, Officer Austin testified:

> First thing I saw was the back window. The back window was basically like a spider[ ]web effect as far as when, you – you know, you break something, it has a spider[ ]web. It looked like the point that it was about to break. And there was a point, I forgot where it was actually on the window, but you could tell where something had entered into the back window.

Officer Austin testified that he saw ricochet marks on the victim's car, and there was a bullet hole in the rear passenger door.

Officer Austin testified that he asked the victim who she believed shot at her car, and she "said she had saw a figure in the back window, and she swore to me at that point that she thought it was her . . . ex-boyfriend, [the petitioner]." Officer Austin further testified that the victim "said that she could see – recognized him, that she had been with him for a very long time and that she recognized right off the bat it was him[.]" Officer Austin testified that someone later approached them at the factory and said that they believed that [the petitioner] was at work in the factory. He said that they entered the gate and saw [the petitioner] walking across a breezeway, and they made contact with him. Officer Austin noted that someone had also advised them that [the petitioner] was not supposed to be on the property at that time. [The petitioner] told police that he had been at someone else's house that night. Officer Austin was then advised by his supervisor to take [the petitioner] into custody, and he was transported to jail. They did not find a weapon in [the petitioner]'s possession.

Ron Pugh is an investigator with the Major Crimes Unit of the Jackson Police Department. He arrived at the Kellogg factory at approximately 5:30

to 6:00 a.m. on February 10, 2015. Investigator Pugh learned what happened from Officer Austin, and the officer took him to the victim. She was "visibly upset" and immediately began to tell Investigator Pugh that shots had been fired at her car. Investigator Pugh testified that he inspected the victim's car and noted the "car had been shot." He said that the back glass was knocked out, and there were a couple of bullet marks on the door. Investigator Pugh testified that no gun or shell casings were ever found, and no bullets were recovered from the vehicle. Investigator Pugh took a formal statement from the victim at the scene.

Investigator Pugh was advised that the victim had identified the shooter as [the petitioner], her ex-boyfriend, and that he had been taken into custody after showing up at the factory. Investigator Pugh first saw [the petitioner] when [the petitioner] arrived at the police department at approximately 2:30 p.m. for an interview. Sergeant Brian Spencer was also present. Investigator Pugh advised [the petitioner] of his *Miranda* rights, and [the petitioner] signed a waiver. [The petitioner] then gave the following statement: "I wasn't – it wasn't supposed to happen like that at all. The car got shot at. No harm was meant toward her. It was just to scare her. I fired the gun. [The victim] wasn't supposed to get hurt at all."

Rachelle Fjeldahl, a records keeper for Employment Pro, a staffing agency for the Kellogg plant, testified that [the petitioner] was employed by Employment Pro to work in the Kellogg factory. She said that he worked for Aldelano, which is a "partnership with Kellogg's." [The petitioner] was not scheduled to work at the factory on February 9-10, 2015.

At the close of the State's proof, a certified copy of a judgment from the Haywood County Circuit Court was entered showing that [the petitioner] had been convicted of aggravated robbery on May 16, 1996.

*State v. Troy Lee Springfield*, No. W2017-01013-CCA-R3-CD, 2019 WL 920312, at *1-2 (Tenn. Crim. App. Feb. 22, 2019), *perm. app. denied* (Tenn. June 21, 2019).

## II. Post-Conviction Hearing

The petitioner filed a timely pro se petition for post-conviction relief in which he raised numerous claims, including an allegation of ineffective assistance of counsel. The post-conviction court appointed counsel, but the petitioner filed an amended petition of his own accord in which he, among other things, reiterated his claim of ineffective assistance of counsel.

- 4 -

At the onset of the evidentiary hearing, the petitioner's post-conviction counsel notified the post-conviction court that he had subpoenaed Latoya Avant, an alleged alibi witness, but it was counsel's understanding she had not been served. Post-conviction counsel said he had spoken to Ms. Avant on the phone and "[s]he said it wouldn't be a problem, but [he] didn't trust that, so [he] sent a subpoena out[.]" The post-conviction court noted the matter was set for a hearing the previous month, and post-conviction counsel had requested the matter be reset because Ms. Avant was unable to attend that day due to a personal matter. However, Ms. Avant had informed counsel she would accept service for the next hearing date. Post-conviction counsel responded, "[Ms. Avant] told me she would be here. I had my doubts, so I tried to subpoena her[,]" but he did not know why she was not served. The court recalled the matter had been reset a number of times and determined to proceed with the available witnesses and revisit the issue later.

The petitioner's trial counsel testified he was hired to represent the petitioner at the trial stage in the matter.[1] The petitioner had previously been represented by a public defender, as well as another attorney who had represented him at the preliminary hearing. Counsel reviewed the transcript of the preliminary hearing in the course of his representation and noted Ms. Avant testified at the hearing. Ms. Avant was available to testify at the petitioner's trial, and counsel discussed with the petitioner the possibility of her testifying. Counsel said the petitioner "was not very insistent upon using her," and counsel ultimately made the strategic decision not to call her.

Trial counsel recalled the petitioner made a statement after his arrest in which he said, "It wasn't supposed to happen like that at all. The car got shot at. No harm was meant toward her. It was just to scare her. I fired the gun. [The victim] wasn't supposed to get hurt at all." In light of the petitioner's statement, counsel believed he would "be taking contrary positions" if he called Ms. Avant as an alibi witness. Counsel feared it would raise credibility concerns and the jury "would turn on [the petitioner]" if they presented the conflicting theories of defense of "I didn't mean to hurt her" and alibi.

Moreover, trial counsel thought the statement "could be used actually in [the petitioner's] favor. He was very remorseful. He . . . apologized for doing that. He testified he had no intention of hurting her, which would, in my opinion, possibly negate the intent requirement on the murder charge." Counsel and the petitioner "discussed on numerous occasions that this wasn't a case of trying to win this thing, but possibly trying to mitigate the damages." Counsel believed the best course of action was to try "to knock this matter

---

[1] We limit our recitation of the testimony at the evidentiary hearing to that relevant to the petitioner's issue on appeal.

down" to an attempted voluntary manslaughter. The petitioner agreed with counsel's chosen trial strategy.

Trial counsel also determined Ms. Avant had "some serious credibility issues[.]" He remembered Ms. Avant had testified the petitioner was with her at 3:30 and 5:30 the morning of the incident, but the petitioner "was taken by the police prior to 5:30 that morning at Kellogg's. If I'm not mistaken, he also advised the police officer that she had driven him to Kellogg's and let him out and then the officers, I believe, found his car on the parking lot there at Kellogg's." Counsel said he spoke with Ms. Avant a number of times and "never got the sense in talking with her that she was sincere about what she was saying." He also got the impression the prosecutor "would do serious harm to her on cross-examination."

Trial counsel was further concerned that calling Ms. Avant as a witness would "open[] the door, so to speak, to allow cross-examination with some of [the petitioner's] prior charges," if Ms. Avant "started talking about what a nice fella and good guy he is[.]" Counsel wanted the jury to believe what the petitioner said in his statement "that he had no intention of hurting her, not harming her, he was just trying to scare her" and was afraid "the jury would turn on him" if it learned about some of his prior convictions.

After the conclusion of trial counsel's testimony, the post-conviction court returned to the issue of Ms. Avant's failure to be at the hearing. The court noted Ms. Avant was "not very reliable . . . if she says she's going to be here, and then doesn't show up." The court determined it was "not going to delay this any longer."[2] The petitioner chose not to testify at the evidentiary hearing.

The post-conviction court entered an order denying the petition, along with a letter outlining the court's reasoning and accrediting trial counsel's testimony. The court noted counsel testified that he and the petitioner discussed the State's evidence and developed a trial strategy and that counsel interviewed Ms. Avant as a potential alibi witness for the defense and determined she was not a credible witness. Trial counsel determined "an alibi defense was not a plausible defense since the [petitioner] had given a written statement to the police admitting that he had in fact fired a gun at the victim[.]" The post-conviction court also noted the petitioner's failure to testify at the evidentiary hearing or call any witnesses in support of his claims. The court concluded the services rendered by counsel were within the range of competence and professional norms, and the petitioner failed to show counsel's performance was deficient or any alleged deficiency caused him prejudice.

---

[2] On appeal, the petitioner does not raise any issue concerning the post-conviction court's decision not to delay the matter in an attempt to secure Ms. Avant's presence. However, even if Ms. Avant had testified, such would have had no impact on this Court's ultimate decision.

*Analysis*

The petitioner argues he received ineffective assistance of counsel because trial counsel failed to follow his request to present an alibi defense through witness Latoya Avant. The State insists the petitioner failed to meet his burden by not presenting Ms. Avant at the post-conviction hearing. Furthermore, the State argues trial counsel made "the deliberate and strategic decision not to call Ms. Avant as a witness because he felt she would hurt, rather than benefit, the petitioner's defense." Upon our review, we agree the petitioner has failed to meet the burden required of him and affirm the decision of the post-conviction court.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is de novo, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations de novo, affording a presumption of correctness only to the post-conviction court's findings of fact. *Id*.; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id*. Thus, courts are not required to even "address both

components of the inquiry if the defendant makes an insufficient showing on one." *Id*.; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Initially we note the petitioner failed to produce Ms. Avant, his alleged alibi witness, at the post-conviction hearing and, thus, failed to establish prejudice. In order to succeed on a claim that counsel did not properly investigate or call favorable witnesses at trial, a petitioner must generally elicit favorable testimony from those witnesses at the evidentiary hearing, as a post-conviction court may not speculate "on the question of . . . what a witness's testimony might have been if introduced" at trial. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

Despite the petitioner's failure to produce Ms. Avant as a witness, the petitioner's assertion that he requested trial counsel present an alibi defense through Ms. Avant is contrary to counsel's testimony at the evidentiary hearing that the petitioner "was not very insistent upon using [Ms. Avant.]" Furthermore, trial counsel's testimony, which was accredited by the post-conviction court, shows counsel made a deliberate and strategic decision not to present an alibi defense through Ms. Avant.

Trial counsel spoke with Ms. Avant a number of times and determined she was not a credible witness. He "never got the sense in talking with her that she was sincere about what she was saying[,]" and he got the impression the prosecutor "would do serious harm to her on cross examination." Counsel was also concerned that calling Ms. Avant as a witness could "open the door" to cross-examination about the petitioner's prior convictions, which would further cause him harm with the jury. Further, in light of the petitioner's statement to police admitting to firing the gun, counsel determined presenting an alibi defense would be taking contrary positions and raise credibility concerns with the

jury. Counsel believed, however, the petitioner's statement could "possibly negate the intent requirement on the murder charge." After discussing with the petitioner, counsel made the tactical decision to pursue a strategy of attempting to "mitigate the damages" by trying "to knock this matter down" to attempted voluntary manslaughter. The petitioner agreed with the strategy, and counsel successfully convinced the jury to convict the petitioner of a significantly lesser offense, attempted voluntary manslaughter, than the original charge, attempted first-degree murder. We discern no deficiency in counsel's performance.

We need not reach the prejudice prong of the *Strickland* analysis because the record readily shows trial counsel did not render deficient performance. However, even if counsel called Ms. Avant as an alibi witness, there is no reasonable probability the outcome of the proceeding would have been different. The victim identified the petitioner as the person who shot at her vehicle, and the petitioner gave a statement to police admitting he fired the gun. *See Troy Lee Springfield*, 2019 WL 920312, at *2.

### *Conclusion*

Based on the foregoing authorities and reasoning, we affirm the judgment of the post-conviction court.

_____
J. ROSS DYER, JUDGE